DAVID A. NORTON v. BENAIAH THARP, ADM'R, ET AL.

*Collusive foreclosure—Laches—Affirmance of sale.*

1. The assignee of a mortgage, is, in exercising his power to foreclose, in the position of a trustee toward those who are interested in the equity of redemption, and is bound to treat them fairly and in good faith; and if he designedly forecloses without the knowledge of a tenant-in-common, so that the latter is deprived of chances to redeem that notice would have given him, the latter is entitled to equitable relief on making seasonable prayer therefor.

2. A mortgage upon the land of two tenants-in-common was assigned and foreclosed by collusion with one of them and without the other's knowledge, and the surplus was paid to the former. The latter forced him however to disgorge his share, but after learning of the collusive foreclosure he filed a bill to set it aside, tendering the amount of the mortgage, the costs of foreclosure and his share of the surplus. But as four or five months had passed after learning enough to put him on inquiry before he filed the bill, and as he had meanwhile affirmed the sale to the extent of buying in the other tenant's equity of redemption which the tenant had sold to a representative of the foreclosure purchaser, and as he had not tendered the whole amount of the surplus but only his share, his bill was dismissed.

Appeal from Cass. (A. J. Smith, J.) Feb. 7.—Mar. 6.

BILL to redeem. Defendants bring error. Reversed.

*Harsen D. Smith* and *Spafford Tryon* for complainants.

*Howell & Carr* for defendants.

CHAMPLIN, J. The bill in this cause was filed July 24, 1882, to redeem from a foreclosure of a mortgage by advertisement.

The bill is quite lengthy, but the material allegations are that in 1872 the complainant and his brother, the defendant Nathan Norton, were equal owners as tenants in common of a valuable farm in Cass county, upon which there existed a mortgage of $400, held by one Oliver S. Dean, of Massachusetts; that for a number of years prior to 1881 the complainant had sole possession of the farm, under an arrangement with his brother to pay him rent for his half; that one Absalom H. Ashton, whose farm joined complainant's, was anxious to buy complainant out, but complainant would not sell. And the bill alleges that in March, 1881, said Ashton and said Nathan Norton (who was unfriendly to complainant) entered into a fraudulent and collusive scheme for the purpose of defrauding the complainant out of his interest in the farm; that the scheme consisted in secretly procuring said mortgage to be assigned to said Ashton, and then foreclosing the same in the fraudulent manner particularly described in the bill.

The principal item of fraud relied upon in the proceedings to foreclose is, that the notice of sale was inserted in a newspaper published in a remote part of the county from the premises, and which did not circulate in that neighborhood, *for the express purpose of keeping all knowledge of the proceedings from the complainant.*

It is alleged that it was agreed between said Ashton and defendant Nathan Norton that Ashton should bid in the farm at $4000, and after deducting the amount of the mortgage, should pay over to Nathan Norton the remainder, who was to retain the same as his part of the spoils; that upon learning that the mortgage had been foreclosed, and the surplus money all paid to Nathan Norton, the complainant brought

suit against him to recover one-half of the same, and by garnishing the First National Bank of Cassopolis succeeded in compelling Nathan Norton to pay over one-half of the surplus money; that after the complainant received one-half of the surplus money, facts came to his knowledge showing that the foreclosure proceedings were fraudulent, and he thereupon tendered to the administrator of said Absalom H. Ashton (Ashton having died in September, 1881) the surplus money received by him, together with the full amount of said mortgage and costs of foreclosure, including an attorney fee and interest thereon ; that the administrator refused to accept the money, and the complainant then made the same tender to the register of deeds, who also refused to accept the same.

The complainant thereupon filed this bill, and a decree was entered in the court below setting aside the foreclosure sale upon the complainant paying to the administrator the surplus money received by him and the amount found due on the mortgage. The complainant, since the decree, has tendered the said amount to the administrator, who declined to accept the same, and the administrator, together with the defendants Nathan Norton and Marion Ashton, have appealed to this Court.

The facts are briefly these : In 1871 Nathan Norton, being the owner of the land, mortgaged it to Latham Hull, and afterwards, in April, 1872, conveyed an undivided half thereof to complainant, who went into possession, and used and occupied the whole under an arrangement with Nathan, by which he was to pay him a certain rent, and the taxes for the use of his half. June 26, 1881, Hull sold and assigned the mortgage to Oliver S. Dean, of Milford, Massachusetts. There seems to have been some disagreement between the brothers, Nathan and David, prior to the spring of 1881, the nature or cause of which is not disclosed in the testimony. Absalom H. Ashton was a farmer who owned a farm adjoining the Norton place, and had evinced a desire to purchase it of Nathan and David, and on one occasion offered David $50 an acre for his half interest, which offer David declined.

Afterwards, at the suggestion and with the active assistance of Nathan, he purchased and procured an assignment of the mortgage from Dean for the purpose of foreclosing the same.

The mortgage was assigned to Ashton by Dean April 12, 1881, and in May following he began foreclosure by advertisement in the Dowagiac *Republican,* which was not the nearest newspaper, and which was not circulated in the neighborhood of the land. On the 29th of ·July, 1881, the land was sold by the sheriff to Ashton for four thousand dollars. The amount then claimed to be due upon the mortgage, including costs, was five hundred and twenty dollars and 83 cents, and the remainder of the bid, three thousand four hundred and seventy-nine dollars and 17 cents, was paid by Ashton to the sheriff, and by him to Nathan Norton, the mortgagor. Nathan deposited this amount in the First National Bank of Cassopolis, and on the next day notified complainant of the foreclosure and sale, and of his own intention to not redeem. Complainant thereupon at ·once caused the arrest of Nathan for embezzlement, and began suit against him for half the surplus; the criminal proceeding continued in court for some months and was finally dismissed. In the civil suit issue was joined, and a set-off amounting to a large sum was claimed by Nathan. While this suit was pending, and about the 1st of September, 1881, Ashton died, leaving a number of children and grandchildren who are made defendants. Benaiah A. Tharp was appointed his administrator.

On the 5th of September, 1881, Nathan Norton conveyed all his interest in the land to Marion Ashton, a son of A. H. Ashton, deceased, and on the 5th of October, 1881, Marion Ashton conveyed his interest in the land to the complainant for one hundred and thirty dollars, by an ordinary quitclaim deed containing this recital: "Hereby intending only to convey the interest that I may have acquired through a quitclaim deed from Nathan Norton to me, dated September 5, 1881, and recorded in Liber 56 of Deeds, page 547, and not conveying any interest that I may now have or

hereafter acquire through sheriff's deed to my father on said land now on file in register's office, on foreclosure of a mortgage recorded in Liber X of Mortgages, page 364, Cass county, Michigan." Prior to this time (October 5th, 1881,) the complainant had learned that the assignment of the mortgage had been procured through the efforts of his brother Nathan, and that Nathan was holding all the money; and he had examined the list of subscribers in the office of the Dowagiac *Republican*, and had ascertained that the paper was not taken in his neighborhood. On the 20th of February, 1882, the complainant settled with his brother Nathan for one-half of the surplus money, Nathan paying David sixteen hundred dollars, and the balance being allowed by David to Nathan on an indebtedness due from David to him; and the suit was thereupon discontinued.

There can be no doubt from the proofs in this case of the facts that Absalom H. Ashton acquired this mortgage for the purpose of foreclosing the same, and that he so contrived and conducted the proceedings that David Norton was not made aware of the sale until after it had occurred. His object was to force David to a sale of the premises and to acquire the title himself.

We are not satisfied that the premises did not bring all they were worth on a cash sale. The witnesses vary in their opinions of the value of the farm from forty-five dollars to sixty-five dollars an acre, and so far as the price is concerned it does not appear to have been inadequate. But this does not relieve Absalom H. Ashton from the fraudulent character of his action in keeping the proceedings secret from David Norton. He knew that David owned an undivided half of the mortgaged premises and was interested in the equity of redemption. While a sale would not affect his right of redemption, yet a sale for the full value of the property might effectually prevent him from redeeming, especially if he should be obliged to rely upon raising the money for that purpose by mortgage on his interest. He only owned an undivided half, but in order to redeem he

would be obliged to pay the whole purchase price; and it is quite apparent that a person so situated might be entirely unable to secure the money to enable him to redeem. Nathan had notified him that he should not redeem, and therefore it was thrown upon him, in the first instance, to raise the whole amount. He could have avoided raising so considerable an amount had he known before sale of the proceedings to foreclose; and could have paid the amount due and called upon Nathan to pay his just proportion of such amount. But this he was precluded from doing by the manner in which the holder of the mortgage chose to exercise the right to foreclose under the power of sale therein given. Ashton, in the execution of this power, occupied the position of trustee toward those interested in the equity of redemption, and was called upon by his relation to the parties to exercise good faith and fair dealing. His acts and object were contrary to those salutary principles, and cannot be countenanced in a court of equity, when timely application is made to it by the injured party for relief.

The question is presented by this record whether the complainant has not so acted as to preclude himself from the relief he prays for, and which was granted him in the court below. As claimed in his bill of complaint, his right to relief is based upon the fraudulent acts and design of the holder of the mortgage to effect a sale without his knowledge. The means employed have already been stated. Upon the discovery of the fraud the complainant was called upon to act promptly if he sought to be relieved from the consequences thereof, and especially was it incumbent upon him to do no act in affirmance of the foreclosure proceedings. He does not allege in his bill when he was first apprised of the fact that the foreclosure proceedings were intended as a fraud upon his rights, and there is the same want of definiteness in his proofs. The general question was asked him: "At the time you received half the so-called surplus money were you aware of the facts that you set up in your bill?" This question was objected to as being indefinite and leading. The witness answered: "I was not aware of the facts set up in the bill

other than that it had been advertised in the Dowagiac paper, but I had known nothing of the amount of money being wanted that was due on the mortgage. I supposed the mortgage was in Milford, Massachusetts, until after the sale." Complainant was then asked: "After settling that suit, and receiving part of the surplus money, did the additional facts come to your knowledge?" He replied: "They did."

What additional facts counsel and witness are referring to is left wholly to conjecture. The witnesses Ricket and Ford testify to certain conversations which they had with Ashton relative to his advertising in the Dowagiac paper for the purpose of obtaining a sale without David's knowledge, but it is not shown when they communicated their information to complainant. The only witness who is shown to have informed complainant of the admissions made by Ashton was Sampson Norton, another brother of complainant, who had been instrumental in bringing about a settlement between David and Nathan, and he is not clear as to the time when he made the fact known to complainant, but David says it was the next day after the settlement, which occurred on the 20th day of February, 1882, and this, he says, was the first time he had learned any "additional facts."

Complainant's investigations, made immediately after the sale and prior to the purchase of the equity of redemption from Marion Ashton, disclosed to him all the acts of Nathan Norton and Absalom H. Ashton which tended to prove that a fraudulent purpose existed to so manage the foreclosure as to keep him from obtaining knowledge of the sale until after it had transpired. They were sufficient to put him upon inquiry among his neighbors to ascertain such facts as were within their knowledge as to the foreclosure and sale. Mr Ricket was a near neighbor, and lived upon an adjoining farm, and Ford was a laborer in his employ, and both, from all that appears, were on friendly terms with complainant, and it is to be presumed that if he had made inquiry of either of these witnesses he would have been informed of what Ashton had told them as early as August, 1881. The proof shows that complainant was possessed of knowledge of the fraudulent

acts and object of his brother Nathan and of Absalom H. Ashton prior to October 5, 1881, and the only additional evidence of their fraudulent intention acquired after that time was the admission of Ashton, communicated to him through his brother Sampson. He was therefore called upon to make his election between relying upon them as being of sufficient importance to justify him in setting aside the sale as fraudulent as to him, and the affirmance of the sale by a purchase of the equity of redemption held at the time of the sale by Nathan Norton, and the acceptance of his share of the surplus money produced by the sale.

There is a disagreement between the testimony of complainant and Marion Ashton with reference to the purpose for which he sold and David bought the equity of redemption. It appears that after the death of Absalom H. Ashton, Nathan Norton conveyed his undivided half of the premises to Marion Ashton, a son of Absalom. The purpose of this was to enable Marion Ashton to obtain possession of the premises sold before awaiting the expiration of the period for redemption. Instead, however, of entering into joint possession with David, Marion agreed to rent his interest to David for $120 a year. Both David and Marion agree in this. A different arrangement was however made, by which Marion sold and David bought the equity of redemption then held by Marion. Marion says that complainant desired to purchase so as to enable him to mortgage the whole land to raise money to redeem from the foreclosure sale, and upon those considerations he sold for $130 instead of renting for $120. Complainant denies this, and says that he bought without any reference to redeeming. Whichever may be the true version, it makes no difference with the result. In either event it was an act in direct affirmance of the sale, under the circumstances of this case. Complainant had brought a suit against Nathan for his share of the surplus money; had caused him to be arrested for embezzlement; both of which suits were then pending; had been told by Nathan that he should not redeem, from Nathan's letters to him and to Mr. Dean, and from his investigations, he was aware of the fraud perpetrated on him in obtaining a sale without his knowledge,

and when, in view of these facts, he purchased Nathan's equity of redemption, and received from him one-half of the surplus money arising from the sale, he must be held to have waived any objections he may have had to the manner in which such sale was brought about. He cannot knowingly partake of the fruits of iniquity and then ask a court of equity to relieve him from its injurious effects. His purchase of the equity of redemption from Marion Ashton placed him in position where, upon redemption under the foreclosure, he would become the absolute owner in fee of the whole premises. But to make such redemption effectual, he was required to pay to the purchaser the whole amount bid at the sale, with the interest. How. Stat. § 8507. This he did not do. He only tendered to the administrator of Absalom H. Ashton the amount due on the mortgage, and one-half of the surplus which he had received, with interest. The administrator refused to accept because it was not sufficient in amount.

Complainant contends that he was not obliged to pay the full amount of the bid at the sale, because the purchase by Absalom H. Ashton was not made in good faith, for reasons stated in his bill of complaint. The result of giving force to this position would be that the heirs to the estate of Ashton would be punished by the forfeiture of over seventeen hundred dollars, which went to Nathan Norton, and which he received as the purchase money for his undivided half interest in the land, while complainant would become the absolute owner of the whole premises by paying six hundred and eighty-five dollars and thirty cents over the surplus money he had received from the sale. This would be inequitable, in view of the position occupied by the parties at the time the tender was made. Complainant has not shown sufficient reason why he should be relieved from tendering or paying the amount required by the statute to effect a redemption.

The bill of complaint must therefore be dismissed, with costs of both courts.

The other Justices concurred.